**In re RIVER CAPITAL CORPORATION (f/k/a Riht Capital Corporation), Debtor.**

**Bankruptcy No. 89–01732–AT.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

June 21, 1991.

W. Stephen Paleos, Alexandria, VA, for debtor.

Robert G. Mayer, Fairfax, VA, for IBHC.

Stanley M. Salus, Wickwire, Gavin & Gibbs, P.C., Vienna, VA, for Unsecured Creditors Committee.

Larry L. Gregg, Asst. U.S. Atty., Alexandria, VA, for SBA.

Frank Bove, Office of the U.S. Trustee, Alexandria, VA.

### *MEMORANDUM OPINION*

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

On March 7, 1991, the court held hearing on confirmation of the debtor's chapter 11 plan. Other issues considered at the hearing included: (1) a motion by Island Brook Holding Company ("IBHC") for temporary allowance of its claim for purposes of accepting or rejecting the plan; (2) objections to the plan filed by IBHC and the Small Business Administration ("SBA").

During the course of the hearing the court denied IBHC's motion, overruled the

objections to confirmation and ruled that the plan would be confirmed. This opinion supplements the court's bench ruling.

River Capital Corporation ("River"), as debtor in possession, filed its amended disclosure statement and chapter 11 plan of reorganization on August 28, 1990.

On December 31, 1990, River sent copies of its plan, together with the approved amended disclosure statement, a notice of hearing on confirmation, the order approving disclosure statement, and a ballot to the creditors, the U.S. Trustee, the equity security holders, and other parties in interest.

In response, River received numerous ballots and two objections to the plan. According to the ballots, 100 percent of the claimants eligible to vote and who did vote, had voted to accept the plan. This unanimous vote included class 1—Administrative Claimants, class 2—Priority Claimants, class 4—Secured Claimants, class 5—Unsecured Claimants, and class 8—Common Stockholders.[1]

The two objections to confirmation were filed by SBA and IBHC.

Hearing on confirmation of the plan was originally scheduled for February 7, 1991. On that day, however, IBHC filed its motion to temporarily allow its claim for plan voting purposes. In addition, counsel for the unsecured creditors committee sought an additional opportunity to canvas the committee to determine whether it supported or resisted confirmation of the plan.

The hearing was continued to March 7, 1991, at which time a full evidentiary hearing was held on IBHC's motion, the two objections to the plan, and the plan itself. Upon consideration of the evidence and argument, the tally of votes on the plan, and upon the recommendation of the creditors committee and the examiner, the court denied IBHC's motion, overruled the two objections, and confirmed the plan as filed.

*Bankruptcy Rule 3018(a).*

IBHC filed a proof of claim in the amount of $3,000,000.00. River filed an objection to that claim. 11 U.S.C. § 1126 permits those having a claim or interest to vote only if their claim has been allowed pursuant to § 502. In turn, § 502(a) provides that a claim is not allowed if subject to an unresolved objection. Therefore, IBHC was ineligible to vote by virtue of River's unresolved objection to its claim. However, Bankruptcy Rule 3018(a) provides a mechanism for temporarily allowing a claim for purposes of voting.

Thus, IBHC's motion to temporarily allow its claim under Rule 3018(a) presented a threshold matter. Due to the size of IBHC's disputed claim, its single negative vote would have resulted in a rejection by the class 5 claimants. Resolution of this motion would determine the appropriate factual and legal issues that would need to be addressed by the remainder of the hearing. Accordingly, evidence and argument were heard first on IBHC's motion.

IBHC's disputed claim arises from its lawsuit to recover environmental damages to its property allegedly caused by Michael Kober, K.M.K. Investments, Inc., Bridgeport Heat Treating Company ("Bridgeport"), Robert A. Gray, and by the debtor River.

Any liability of River for this damage would have arisen from its relationship with Bridgeport during Bridgeport's business operations on the property as IBHC's tenant. At hearing IBHC did not allege River directly caused any of the environmental contamination but rather that River's liability arose from its "operation and ownership" of Bridgeport which occupied the property.

IBHC's general partner testified that Bridgeport was irregular in its payments of rent and relied upon River for financing. River's president testified that River did provide financing for Bridgeport but neither involved itself in the operations of that company nor foreclosed on its position

---

**1.** The class 3, secured claim of Signet Bank had been settled and paid. The class 6 and class 7 claims were to receive nothing under the plan and were deemed to reject the plan pursuant to 11 U.S.C. § 1126(g).

when Bridgeport defaulted on its obligations to River. His testimony, which was unrefuted, revealed as follows: River did not require Bridgeport to seek River's approval before shipping goods; River did not dictate when and to whom Bridgeport was to ship goods; River did not determine whom Bridgeport should hire and fire; River did not supervise the administration of Bridgeport on-site or elsewhere; River did not involve itself with Bridgeport tax reports; River did not control access to the Bridgeport facility and did not involve itself with the selling of Bridgeport fixtures or equipment. In short, the court heard testimony that River had nothing to do with Bridgeport operations and had nothing to do with hazardous waste disposal. Therefore, the testimony establishes to the court's satisfaction that River made a loan, bought a minority position in Bridgeport stock, and monitored its loan and investment through a single member of Bridgeport's five member board of directors.

IBHC's theory of River's liability rests on the strict liability provisions of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601—9657 ("CERCLA"). Both River and IBHC relied heavily on the interpretation of potential lender liability under CERCLA expressed by the 11th Circuit in *United States v. Fleet Factors Corp.*, 901 F.2d 1550 (11th Cir.1990).

In *Fleet Factors* the 11th Circuit adopted a test extending CERCLA liability to a secured lender who "participate[s] in the financial management of a facility to a degree indicating a capacity to influence the corporation's treatment of hazardous waste." *Fleet Factors*, 901 F.2d at 1557. Without adopting the expansive liability language set forth in *Fleet Factors*, this court notes that *Fleet Factors* involved a secured creditor engaged in far more control over the operations of the facility than is present in this case. *See Fleet Factors*, 901 F.2d at 1559. The evidence presented at hearing is not sufficient to indicate that River participated in the financial management of Bridgeport at all. Therefore, the court determines that even under *Fleet Factors*, River would not be liable for the CERCLA violations of Bridgeport.[2]

█ Temporary allowance of the claim for purposes of voting, pursuant to Bankruptcy Rule 3018(a), is left to the court's discretion. *Matter of Gardinier, Inc.*, 55 B.R. 601, 604 (Bankr.M.D.Fla.1985). Since the court finds from the evidence presented that River did not have the requisite control over Bridgeport to be held liable for the environmental contamination allegedly created by Bridgeport, IBHC's motion to temporarily allow its claim for purposes of voting on the plan is denied.

*IBHC's Objections to Confirmation.*

█ IBHC objects to confirmation of River's plan on several grounds. The first objection is based on an argument that River's plan permits River to retain 40 percent of the net proceeds after liquidation of its assets. IBHC argued that such a provision violates the absolute priority rule set forth in 11 U.S.C. § 1129(b)(2)(B)(ii)[3] and

2. Since the writing of this opinion the definition of "owner or operator" in CERCLA was amended. The CERCLA definition of "owner or operator" now states that:

... Such term does not include a person, who, without participating in the management of a ... facility, holds indicia of ownership primarily to protect his security interest in the ... facility.

*See* 42 U.S.C. § 9601(20)(A) (1992).

This change effectively excludes from the definition of "owner or operator" lending institutions that acquire ownership or control of property to realize on a security interest held by such institution in such property.

3. Because the court denies the IBHC motion to vote in class 5, IBHC is effectively a minority creditor within an accepting class. Accordingly, IBHC cannot demand plan compliance with the absolute priority rule because § 1129(b)(2)(B)(ii) applies only when the class as a whole has rejected the plan. *See* David G. Epstein *et. al.*, Bankruptcy § 11–27 (1992).

Class 5 has accepted the plan for the purposes of § 1129 because all the creditors eligible to vote in class 5 have accepted the plan. Section 1126 specifies the required amount and number of acceptances for a class of creditors. A class of creditors has accepted a plan if at least two-thirds in amount and more than one-half in number of the allowed claims of the class *that are voted* are cast in favor of the plan. The amount and number are computed on the basis of *claims actually voted* for or against the plan,

the liquidation test set forth in 11 U.S.C. § 1129(a)(7)(A)(ii).

■ Under the absolute priority rule, no class can be "crammed down" if any junior class receives any distribution under the plan. According to IBHC, River's stockholders would receive something of value if River were left with 40 percent of the value of its assets. As demonstrated in the plan and reinforced by the evidence in the record, however, River's existing shareholders as such get nothing. The plan provides for the issuance of new stock in exchange for the dollar value of any administrative claimant choosing stock instead of cash. Therefore, the residual value flows not to a junior class of claimants, but rather to a new class of stockholders represented by the administrative claimants.[4]

■ IBHC also objects because it claims that under a chapter 7 liquidation, the creditors would receive 100 percent of the value of the assets rather than 60 percent as proposed in the plan. To the extent that this argument averred creditors would receive a greater actual return on their claims the court finds to the contrary.

The testimony of River's president is persuasive evidence that under a chapter 7 liquidation the unsecured creditors would get nothing. River is a Small Business Investment Company ("SBIC") venture capital lender whose assets are most often loans and investments in closely held and financially fragile businesses, its so-called portfolio companies.

The complex nature of River's investments and the difficulties faced when liquidating them, was described by River's president and graphically illustrated by the litigation engendered in this case. Specifically, to properly liquidate River's assets at anything approaching their value would be a nearly impossible task for a chapter 7 trustee. The unrefuted testimony in the record is that absent current management's active participation in the on-going and planned liquidation, no funds would likely be collected.

This testimony was corroborated by the examiner appointed by the court, who testified that current management was in the best position to liquidate the portfolio. River's president is an attorney with approximately 35 years of experience in the SBIC industry. The examiner, himself familiar with the complexity and peculiarities

---

not as under former chapter X on the basis of the allowed claims in the class. *See* 11 U.S.C. § 1126 (advisory committee notes) (emphasis added).

Accordingly, all voting classes have accepted the plan and it is unnecessary for the court to address IBHC's objection based on issues raised by the "cram down" provisions of § 1129(b). Notwithstanding, the court addresses IBHC's objection to confirmation based on § 1129(b)(2)(B)(ii) assuming arguendo that it is applicable.

4. Peter Van Oosterhout was the only administrative claimant willing to exchange his administrative claim for new stock in River. He is a current stockholder of the debtor as well as its president. However, he also has a bona fide administrative claim of approximately $130,-000.00.

This scenario may arguably violate the absolute priority rule. However, the court believes the "new capital exception" to the absolute priority rule would apply in this case to the extent it survived the enactment of the 1978 Bankruptcy Code.

Since the writing of this opinion the Fourth Circuit has ruled that "even if some limited new capital exception were viable under the Bankruptcy Code" the opportunity to contribute the new value cannot be limited to the equity holders because this exclusive right constitutes property that is retained on account of the equity interest in violation of § 1129(b)(2)(B)(ii). *Travelers Insurance Company v. Bryson Properties, XVIII (In re Bryson Properties, XVIII)*, 961 F.2d 496, 504–05 (4th Cir.1992). Here, all administrative claimants were given equal opportunity to contribute new value. All declined but Van Oosterhout.

It was also suggested that receipt by River's president, Peter Van Oosterhout, of 100 percent of the new stock in River, in exchange for his administrative claim of approximately $130,-000.00, might render the treatment of impaired rejecting classes not "fair and equitable," since the residual value of the company could eventually exceed the present value of his claim. However, the realization in stock value received by the claimant of an amount approaching the $130,000.00 value is highly speculative. In other words, River's stock is worth less than the approximately $130,000.00 Van Oosterhout will forego by converting his claim. Therefore, after reviewing the evidence the court finds that the present value of River's new stock is less than the $130,000.00 administrative claim being paid.

of the small business investment company business, added his support for continued liquidation by current management. This position was echoed by the unsecured creditors committee counsel who stated that this debtor had earned the right to confirmation and reported the support of the creditors committee in favor of the plan.

Accordingly, the court finds that the creditors would likely receive more under the plan than they would under a chapter 7 liquidation.

■ At hearing IBHC also argued that the plan was not feasible. However, the evidence and the history of successful liquidation during this chapter 11 case leads the court to conclude otherwise. River has been and continues to engage in activities to liquidate its portfolio. River has, during the pendency of this case, already successfully liquidated numerous portfolio assets, and extensive testimony was elicited with respect to on-going and future liquidations. River's president has demonstrated good faith, dedication, and competence throughout the case.

Both IBHC and SBA argued that because the plan held out the possibility of merger or acquisition as an alternative to liquidation, the plan was not feasible. Both River's president and the examiner testified, however, that the merger or acquisition option was a reasonable business alternative, due to the potential value of River's $9,000,000.00 net operating loss carry-forward. While River's president would remain focused on liquidation, it would be imprudent to give up the possibility of merger or acquisition that could arise during liquidation. Given the existence and magnitude of the loss carry-forward, it was conceivable that more value for the creditors could be realized if such a possibility arose.

Based on the evidence the court determines that the inclusion of a merger or acquisition option does not render the plan infeasible. All of IBHC's objections to confirmation are therefore overruled.

*SBA's Objections to Confirmation.*

■ SBA raises three objections to River's plan in addition to those of IBHC. First, SBA argued that because River is liquidating its assets, 11 U.S.C. § 1141(d) prohibits the discharge of its debt provided in the plan.[5]

Section 1141(d)(3) of the Bankruptcy Code provides that:

Confirmation of a plan does not discharge a debtor if—

(A) The plan provides for the liquidation of all or substantially all of the property estate;

(B) The debtor does not engage in business after consummation of the plan; and

(C) The debtor would be denied a discharge under section 727(a) of this title if the case were a case under Chapter 7 of this title.

*See* 11 U.S.C. § 1141(d)(3). Since the provisions of § 1141(d)(3) are in the conjunctive, if any one provision does not apply, confirmation of a plan results in the discharge of debt. Setting aside the possibility of merger, River argued that even if River's plan were a straight plan of liquidation, discharge would be appropriate.

The evidence demonstrates that River will continue to engage in business after consummation of the plan. The plan provides for the retention of 40 percent of the residual value for the new stockholders, as authorized by 11 U.S.C. § 1123(a)(5)(A), and current management has indicated an intention to continue to engage in business after consummation of the plan. Therefore, the court finds that confirmation of River's plan would discharge debt and concludes that SBA's objection on this point is not well taken.

■ SBA's second objection is that the plan is open-ended and likely to result in further reorganization. Therefore, SBA asks the court to impose a plan require-

---

**5.** There is no question that whether discharged or not, SBA as an unsecured creditor subordinated to all other debts of the company by statute, would receive nothing under any scenario.

ment for a time limit on the liquidation of assets.

River's plan and the evidence indicate that River is engaged in a focused effort to liquidate its assets. Given the peculiar nature of the portfolio, however, no specific time can be projected, and it would be inappropriate to set a time limit for liquidation, which could require the debtor to further discount its assets.

Inasmuch as River's plan contemplates eventual liquidation, SBA's objection is valid only if it appears that conversion to chapter 7 liquidation is likely. The court has previously concluded that a chapter 7 liquidation would likely result in a substantially greater loss to all creditors compared to liquidation by River's own management.

> The purpose of a liquidating plan in Chapter 11 is to allow the debtor to liquidate his property in a reasonable manner without a forced sale and to effect substantial cost savings.

In re Quality Sign Co., Inc., 51 B.R. 351, 352 (Bankr.S.D.Ind.1985). Here, River has demonstrated its chapter 11 plan will serve this purpose. Therefore, the court concludes that conversion to chapter 7 is unlikely.

■ SBA's final objection is that the preservation in the plan of a merger or acquisition possibility is speculative and leaves River without a reasonable likelihood of rehabilitation through merger with or acquisition by another entity. This objection is based upon SBA's role as a licensing agency whose regulations give it the discretion to disapprove mergers. As a licensed small business investment company, SBA argued River's articles of incorporation limit its activities to performing the functions and conducting the activities contemplated by the Small Business Investment Act. Any amendment to those articles would require SBA approval. Similarly, SBA regulations require SBA approval for any consolidation or reorganization.

SBA argued, without supporting testimony, that it would disapprove any requests made by River to merge with or be acquired by another entity, no matter what terms were proposed. SBA argued that even if the proposal would result in substantial additional value for River's creditors, or even if River were to offer monetary inducement to SBA, SBA would still reject the request.

River's counter-arguments included the following: that it was premature for SBA to irrevocably decide not to permit merger or acquisition; that SBA could not reject a proposal not yet made; that SBA's discretion was limited by the Administrative Procedure Act, that accordingly the SBA could not deny a proposal if to do so would be arbitrary and capricious; and that the Bankruptcy Code contains ample statutory authority to override any arbitrary and capricious decision made by SBA which would redound to the detriment of River and its creditors. Finally, River argued that SBA's own regulations permit the abandonment of an SBA license and the consequent freedom from SBA regulation when the licensee owes no money to SBA; once discharged from the debt to SBA, River could free itself from SBA regulation simply by turning in its license.

The court concludes that SBA's argument is premature. Therefore SBA's third objection to confirmation is also rejected.

Lastly, because River's Plan identifies one or more classes of claims as impaired under the plan, Bankruptcy Code Section 1129(a)(10) requires that "at least one class of claims that is impaired under the Plan, has accepted the plan." River has met this requirement because the class 5—Unsecured Claimants unanimously accepted the plan.

A separate order was entered on June 21, 1991, in which the court found all necessary elements to confirmation were satisfied pursuant to § 1129.